## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **RYAN ZACHARY ROSS, ERIKA MERCADO,** ) | | |
| **C. LOUIS BUNYA, AND DREW HUNNICUTT,** ) | | |
| On behalf of themselves and all others similarly ) | | |
| situated**,** ) | | |
| ) | | |
| **Plaintiffs,** ) | **Civil Action No. <u>4:21-cv-00292</u>** | |
| ) | | |
| **v.** ) | | |
| ) | | |
| **ALLY FINANCIAL, INC.; ALPACA** ) | | |
| **SECURITIES, LLC; CASH APP INVESTING,** ) | | |
| **LLC; SQUARE, LLC; DOUGH, LLC;** ) | | |
| **MORGAN STANLEY SMITH BARNEY, LLC;** ) | | |
| **E\*TRADE SECURITIES, LLC; E\*TRADE** ) | | |
| **FINANCIAL CORPORATION; E\*TRADE** ) | | |
| **FINANCIAL HOLDINGS, LLC; ETORO USA** ) | | |
| **SECURITIES, LLC; FREE FREETRADE,** ) | | |
| **LTD.; INTERACTIVE BROKERS, LLC; M1** ) | | |
| **FINANCE, LLC; OPEN TO THE PUBLIC** ) | | |
| **INVESTING, INC.; ROBINHOOD** ) | **PLAINTIFFS' FIRST AMENDED** | |
| **FINANCIAL, LLC; ROBINHOOD MARKETS,** ) | **CLASS ACTION COMPLAINT** | |
| **INC.; ROBINHOOD SECURITIES, LLC; IG** ) | | |
| **GROUP HOLDINGS PLC; TASTYWORKS,** ) | | |
| **INC.; TD AMERITRADE, INC.; THE** ) | | |
| **CHARLES SCHWAB CORPORATION;** ) | | |
| **CHARLES SCHWAB & CO. INC.; FF TRADE** ) | | |
| **REPUBLIC GROWTH, LLC; TRADING 212** ) | | |
| **LTD.; TRADING 212 UK LTD.; WEBULL** ) | | |
| **FINANCIAL LLC; FUMI HOLDINGS, INC.;** ) | | |
| **STASH FINANCIAL, INC.; BARCLAYS** ) | | |
| **BANK PLC; CITADEL ENTERPRISE** ) | | |
| **AMERICAS, LLC; CITADEL SECURITIES** ) | | |
| **LLC; D1 CAPITAL PARTNERS, L.P.;** ) | | |
| **MELVIN CAPITAL MANAGEMENT** ) | | |
| **LP; MAPLELANE CAPITAL LLC; POINT72** ) | | |
| **ASSET MANAGEMENT, L.P.; SEQUOIA** ) | | |
| **CAPITAL OPERATIONS LLC; APEX** ) | | |
| **CLEARING CORPORATION; THE** ) | | |
| **DEPOSITORY TRUST & CLEARING** ) | | |
| **CORPORATION,** ) | **JURY DEMAND** | |
| ) | | |
| <u>**Defendants**</u> ) | | |

## PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs, Ryan Zachary Ross ("Ross"), Erika Mercado ("Mercado"), C. Louis Bunya ("Bunya"), and Drew Hunnicutt ("Hunnicutt"), on behalf of themselves and all others similarly situated, file this First Amended Class Action Complaint against Defendants, alleging as follows:

## INTRODUCTION

1.      This lawsuit involves a collective injury inflicted on a massive pool of individual stock purchasers (the "Retail Investors") during one of the most fascinating and transformative moments American finance has seen in decades, caused by the conscious parallel anticompetitive conduct of major investment funds (the "Fund Defendants"), stock purchasing clearinghouses (the "Clearinghouse Defendants"), and online retail stock brokerages (the "Brokerage Defendants").

2.      Retail Investors, or individual investors, are non-professional investors that make individual investments on their own behalf.  Retail Investors purchase assets such as stocks, bonds, securities, mutual funds, and exchange traded funds ("ETFs").  They execute their personal trades through websites, web-based applications ("apps"), and trading platforms provided by brokerage firms or other investment providers.  Retail Investors tend to invest smaller amounts, in contrast to institutional investors, and typically have less ability to influence the market prices or market dynamics on their own.

3.      Over the past several weeks, an online forum of clever and eccentric amateur stock enthusiasts, having grown increasingly frustrated by the stranglehold major players maintain over the world of finance, began developing a strategy to capitalize on over-exposed short positions held by some of the nation's most aggressive hedge funds.

4.      "Short" sellers borrow shares or other interests in corporate stock, securities, or other assets. In so doing, they bet that prices of the securities will decrease.  If the stock prices in

fact drop, a short seller then buys the stock back at a lower price and returns it to the lender.  The difference between the sell price and the buy price is the profit.  Short sellers essentially bet on a stock's failure or decline rather than its success or increase.

5.      Noting that short positions for declining video game retailer GameStop far exceeded the available stock, the amateur stock enthusiasts theorized that a collective buying movement coordinated through an online forum could raise the price of stock, potentially triggering a price-inflationary feedback-loop known as a "short squeeze," ultimately punishing several major hedge funds and transferring a large sum of their money to individual investors.  To do this, the online group needed to make the stock an internet meme.

6.      A "short-squeeze" occurs when a stock or other asset rises sharply in value, distressing short positions.  Short selling investors are faced with a rapid increase in the shorted asset's value, exposing the short seller to increased and theoretically limitless loss.  As the price of the asset rises, the short sellers may face pressure to buy back stock to exit their short positions to mitigate their potential losses.  In the absence of intervention, as short sellers exit their positions to buy back their stocks to cover their shorts, the purchase of stock further increases the price of the stock.

7.      Their plan began to slowly gain steam over mid-January 2021.  Other heavily shorted and financially troubled businesses were targeted for meme status in the same way.  By Tuesday, January 26th, 2021, the wider world began to take notice of GameStop and other "Meme Stocks."  These stocks included GameStop (GME), AMC Theaters (AMC), American Airlines (AAL), Bed Bath & Beyond (BBBY), Blackberry (BB), Express (EXPR), Koss (KOSS), Naked Brand Group (NAKD), Nokia (NOK), Sundial Growers Inc. (SNDL), Tootsie Roll Industries (TR), and Trivago NV (TRVG) (the "Relevant Securities").

8.    As the prices rose and understanding began to spread about the ideological underpinnings of the Meme Stock concept, public interest in trading these stocks grew dramatically.

9.    The Fund Defendants, such as Citadel Enterprise Americas LLC, Citadel Securities LLC, Melvin Capital Management LP, and other unnamed co-conspirators, acquired or possessed interest in massive "short" positions in the Relevant Securities.  These were highly speculative bets.

10.    Over the past few years, public entry to stock trading has been reduced by the introduction of greatly simplified and scaled down trading apps for web and mobile devices, such as the services created, offered, and maintained by the Brokerage Defendants.  Defendant Robinhood, for example, claims that its goal is to "democratize finance for all."  Defendant E*Trade proclaims, "It's your money" and suggests that by trading with them you can "Take charge of your finances."  The Brokerage Defendants have become especially popular and heavily used by the entry-level Retail Investor.  As such, when the Meme Stocks came to wider public attention, Defendants' trading platforms were chief destinations for these investors.

11.    When the Relevant Securities increased in value, due in large part to Retail Investors purchasing the Relevant Securities and increasing stock prices, the Fund Defendants, Clearinghouse Defendants, and unnamed co-conspirators were exposed to potential losses of several billion dollars.

12.    As a result, the Brokerage Defendants, Fund Defendants, and Clearinghouse Defendants conspired to prevent the Retail Investors from buying further stock entirely, or implement anticompetitive and unfair restrictions, thereby forcing Retail Investors to hold their

Relevant Securities as the prices dwindled rapidly, or sell their Relevant Securities, which artificially suppressed the stock prices of the Relevant Securities.

13.    On Wednesday, January 27, 2021, the Relevant Securities all underwent explosive growth in prices along with a corresponding rise in public interest.

14.    After the trading day on Wednesday, when non-retail investors were allowed to trade during "after-hours" trading, the Fund Defendants and unnamed co-conspirators coordinated to purchase increased short positions, seemingly in anticipation of a sudden drop in prices, despite the widespread public enthusiasm to the contrary.

15.    That same evening, TD Ameritrade informed its customers that it was enacting restrictions on its users' ability to trade certain meme stocks, including GameStop (GME), AMC Entertainment Holding, Inc. (AMC), and Koss Corporation (KOSS).[1]

16.    Early Thursday morning at 7:15 a.m., a social media user posted a message noting that Robinhood was no longer allowing new purchases of the most popular meme stocks, notably GME, AMC, Nokia ("NOK").[2] Shortly thereafter, at 7:58 a.m., a user posted a screenshot of the Robinhood app showing an error message disallowing additional purchases of AMC.[3]

17.    An hour later, at 8:56 a.m., Robinhood belatedly announced it was restricting purchases on the Relevant Securities.[4] Almost immediately following Robinhood's announcement, Defendant Webull also informed its retail customers that new purchases would not be allowed for GME, AMC, and KOSS.[5] The other Brokerage Defendants made similar restrictions, preventing new purchases of a variety of the Relevant Securities.

---

[1] https://www.wsj.com/articles/outages-continue-to-plague-online-brokerages-11611768827
[2] https://twitter.com/RampCapitalLLC/status/1354780260924063746
[3] https://twitter.com/grinchposting/status/1354790839986216965
[4] https://twitter.com/RobinhoodApp/status/1354805613566410756
[5] https://www.newsweek.com/webull-blocks-gamestop-amc-transactions-stock-market-robinhood-1565172

18.     At 9:00 a.m., the price of GME stock was $469. By 9:20, the price fell to $369. By 10:00, the price continued to fall to $264. By 10:20, it had plummeted to $125.

19.     Over the next hour, with Defendants' retail customers excluded from purchasing and many having sold their shares in panic, a large volume of purchases began gobbling up GME stock at low prices, ultimately boosting the price back above $300. The stock continued heavy trading the remainder of the day. Stock prices for the Relevant Securities showed identical behavior, with the same dramatic rises and falls as the sales and purchases played out.

20.     As this process occurred, millions of dollars were made by traders on this historic day, but the Brokerage Defendants' retail customers were entirely excluded from the process. Even worse, Defendants' actions manipulated the course of the Relevant Securities, disrupting a crowd-sourced collective purchasing strategy in the midst of enormous public enthusiasm and interest in trading these stocks.

21.     Plaintiffs and Class members, faced with the decreasing prices of their stocks, without the ability to purchase new shares, were induced to sell the shares they owned at a lower price. The Brokerage Defendants ensured these were the only options available to the Retail Investors so that they could continue to force prices of the Relevant Securities downward, to the benefit of the Fund Defendants, the Clearinghouse Defendants, and ultimately, the Brokerage Defendants themselves.

22.     In short, the situation that was unfolding was a threat to traditional players in the finance industry, many of whom were the Brokerage Defendants' largest customers, and it could not be allowed to continue.   The perfect storm of circumstances and external pressures caused these Defendants to arrive at a common understanding of what must be done, which they carried out with a combination of explicit agreements and conscious parallelism.   These mutual actions

violated the underlying customer contracts, breached fiduciary duties, and violated the U.S. antitrust law on anti-competitive conduct and price fixing.

## THE PARTIES

### *Plaintiffs*

23.     Plaintiff Ryan Zachary Ross is a resident and citizen of Harris County, Texas.

24.     Plaintiff Erika Mercado is a resident and citizen of Harris County, Texas.

25.     Plaintiff C. Louis Bunya is a resident and citizen of Orange County, California.

26.     Plaintiff Drew Hunnicutt is a resident and citizen of Guadalupe County, Texas

### *The Brokerage Defendants*

#### a.     Defendant Ally Financial, Inc.

27.     Defendant Ally Financial Inc. ("Ally") is a Delaware corporation, with its headquarters located at Ally Detroit Center 500, Woodward Ave., Floor 10, Detroit, Michigan. Ally provides financial services including an electronic trading platform to trade financial assets. Ally sold Relevant Securities directly to members of the Class during the Class Period.

#### b.     Defendant Alpaca Securities, LLC

28.     Defendant Alpaca Securities, LLC ("Alpaca") is a Delaware limited-liability corporation, with its headquarters at 20 N San Mateo Drive Suite 10, San Mateo, California. Alpaca provides financial services including an electronic trading platform to trade financial assets. Alpaca sold Relevant Securities directly to members of the Class during the Class Period.

#### c.     Defendant Cash App

29.     Defendant Cash App Investing, LLC ("Cash App Investing") is a Delaware limited-liability corporation headquartered at 920, SW 6th Avenue Ste. 1200, Portland, Oregon. Cash App Investing is a wholly owned subsidiary of Square Inc. Cash App Investing provides financial

services including an electronic trading platform to trade financial assets. Cash App Investing sold Relevant Securities directly to members of the Class during the Class Period. Square Inc. and Cash App Investing LLC are referred collectively as "Cash App."

### d.   Defendant Dough

30.     Defendant Dough, LLC ("Dough") is a Delaware limited-liability corporation, with its headquarters located at 327 N. Aberdeen Street, Chicago, Illinois. Dough provides financial services including an electronic trading platform to trade financial assets. Dough sold Relevant Securities directly to members of the Class during the Class Period.

### e.   Defendant E*Trade

31.     Defendant Morgan Stanley Smith Barney, LLC ("Morgan Stanley") is a Delaware limited-liability corporation and parent company of E*Trade, with its headquarters located at 1585 Broadway Avenue, New York, New York. Morgan Stanley is the owner and ultimate parent of E*Trade Securities LLC, E*Trade Financial Corporation, and E*Trade Financial Holdings. Morgan Stanley, E*Trade Securities LLC, E*Trade Financial Corporation, and E*Trade Financial Holdings are collectively referred to as "E*Trade."

32.     Defendant E*Trade Securities LLC is a Delaware limited-liability corporation, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Virginia 22203.

33.     Defendant E*Trade Financial Corporation is a Delaware corporation, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Virginia.  E*Trade is a registered broker-dealer with the SEC.  Defendant E*Trade provides trade execution and clearing services for a wide variety of electronically traded products.  Defendant E*Trade sold Relevant Securities directly to members of the Class during the Class Period.

34.     Defendant E\*Trade Financial Holdings, LLC is a Delaware limited-liability corporation, with its headquarters at 671 North Glebe Road, Ballston Tower, Arlington, Texas.

### f.     Defendant eToro

35.     Defendant eToro USA Securities, Inc. ("eToro") is a Delaware corporation and owner of the application eToro, headquartered at 221 River St., 9th floor, Hoboken, New Jersey. eToro provides financial services including an electronic trading platform to trade financial assets. eToro sold Relevant Securities directly to members of the Class during the Class Period.

### g.     Defendant Freetrade

36.     Defendant Freetrade, Ltd. ("Freetrade") is a company incorporated in the United Kingdom, headquartered at 32-38 Leman Street, London, United Kingdom. Freetrade provides financial services including an electronic trading platform to trade financial assets. Freetrade sold Relevant Securities directly to members of the Class during the Class Period.

### h.     Defendant Interactive Brokers

37.     Defendant Interactive Brokers LLC ("Interactive Brokers") is a Delaware limited-liability corporation headquartered at 1 Pickwick Plaza, Greenwich, Connecticut. Interactive Brokers provides financial services including an electronic trading platform to trade financial assets. Interactive Brokers sold Relevant Securities directly to members of the Class during the Class Period.

### i.     Defendant M1 Finance

38.     Defendant M1 Finance, LLC ("M1 Finance") is a Delaware limited-liability corporation headquartered at 200 North La Salle Street, Suite 800, Chicago, Illinois. M1 Finance provides financial services including an electronic trading platform to trade financial assets. M1 Finance sold Relevant Securities directly to members of the Class during the Class Period.

### j.       Defendant Public.com

39.       Defendant Open To The Public Investing, Inc. ("Public.com") is a New York corporation, headquartered at 1 State Street Plaza, 10th Floor, New York, New York. Public.com provides financial services including an electronic trading platform to trade financial assets. Public.com sold Relevant Securities directly to members of the Class during the Class Period.

### k.       Defendant Robinhood

40.       Defendant Robinhood Financial LLC is a Delaware limited-liability corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025.  It is a wholly owned subsidiary of Robinhood Markets, Inc.  Robinhood Financial LLC is registered as a broker-dealer with the U.S. Securities & Exchange Commission ("SEC").  Defendant Robinhood Financial LLC acts as an introducing broker and has a clearing arrangement with its affiliate Defendant Robinhood Securities, LLC.

41.       Defendant Robinhood Securities, LLC is a Delaware limited-liability corporation with its principal place of business at 500 Colonial Center Parkway, Suite 100, Lake Mary, Florida 32746.  It is a wholly owned subsidiary of Defendant Robinhood Markets, Inc.  Defendant Robinhood Securities, LLC is registered as a broker-dealer with the SEC.  Defendant Robinhood Financial LLC acts as a clearing broker and clears trades introduced by its affiliate Defendant Robinhood Financial.

42.       Defendant Robinhood Markets, Inc. is a Delaware corporation with its principal place of business at 85 Willow Road, Menlo Park, California 94025.  Defendant Robinhood Markets, Inc. is the corporate parent of Defendants Robinhood Financial LLC and Robinhood Securities, LLC.

43.     The above-named corporate defendants herein referred to collectively as "Robinhood." Robinhood sold Relevant Securities directly to members of the Class during the Class Period.

### l.     Defendant Stash

44.     Defendant Barclays Bank PLC is a company incorporated in the United Kingdom, and headquartered at 745 7th Ave New York, New York. Barclays Bank PLC is the ultimate corporate parent of, and controls the affairs of Stash Financial, Inc.

45.     Defendant Stash Financial, Inc. ("Stash") is a Delaware corporation and owner of the application Stash, headquartered at 500 7th Avenue,18th Floor, New York, New York. Stash is a wholly owned subsidiary of Barclays Bank PLC. Stash provides financial services including an electronic trading platform to trade financial assets. Stash sold Relevant Securities directly to members of the Class during the Class Period.

### m.     Defendant Tastyworks

46.     Defendant IG Group Holdings PLC is a Delaware public limited company and ultimate corporate parent of and controls the affairs Tastyworks, Inc., headquartered at 200 West Jackson Blvd., Suite 1450, Chicago, Illinois.

47.     Defendant Tastyworks, Inc. is a Delaware corporation and wholly owned subsidiary of IG Group Holdings PLC, headquartered at 100 West Fulton Market Street, Suite 220, Chicago, Illinois (IG Holdings and Tastyworks, Inc. collectively, "Tastyworks").

48.     Tastyworks provides financial services including an electronic trading platform to trade financial assets. Tastyworks sold Relevant Securities directly to members of the Class during the Class Period.

### n.      Defendant TD Ameritrade

49.     Defendant TD Ameritrade, Inc. is a New York corporation with its principal place of business at 200 S. 108th Avenue, Omaha, Nebraska 68154.  TD Ameritrade, Inc. is a subsidiary of TD Ameritrade Holdings Corporation which is in turn a wholly owned subsidiary of The Charles Schwab Corporation.

50.     Defendant TD Ameritrade Clearing, Inc. is a Nebraska corporation with its principal place of business at 200 S. 108th Avenue, Omaha, Nebraska 68154.  TD Ameritrade Clearing, Inc. is a subsidiary of TD Ameritrade Holdings Corporation which is in turn a wholly owned subsidiary of The Charles Schwab Corporation.

51.     Defendant TD Ameritrade Holding Corporation is a Delaware corporation with its principal place of business at 200 S. 108th Avenue, Omaha, Nebraska 68154.  TD Ameritrade is a wholly owned subsidiary of The Charles Schwab Corporation.

52.     Defendant The Charles Schwab Corporation is a Delaware corporation with its principal place of business at 211 Main Street, San Francisco, California 94105.

53.     The above-named corporate defendants herein referred to collectively as "TD Ameritrade." TD Ameritrade sold Relevant Securities directly to members of the Class during the Class Period.

### o.      Defendant Trade Republic

54.     Defendant FF Trade Republic Growth, LLC ("Trade Republic") is a Delaware limited-liability corporation, headquartered at One Letterman Drive, Building D, 5th Floor, San Francisco, California. Trade Republic provides financial services including an electronic trading platform to trade financial assets. Trade Republic sold Relevant Securities directly to members of the Class during the Class Period.

        **p.**       **Defendant Trading 212**

55.     Defendant Trading 212 Ltd. is a Bulgarian company headquartered at 3 Lachezar Stanchev Str., Litex Tower, Floor 10, Sofia 1797, Bulgaria. Trading 212 Ltd. is the ultimate corporate parent of and controls the affairs of Trading 212 UK Ltd.

56.     Defendant Trading 212 UK Ltd. is a company incorporated in the United Kingdom headquartered at 107 Cheapside, London, United Kingdom. Trading 212 UK Ltd. a wholly owned subsidiary of Trading 212 Ltd. (Trading 212 Ltd. and Trading 212 UK Ltd. collectively, "Trading 212"). Trading 212 provides financial services including an electronic trading platform to trade financial assets. Trading 212 sold Relevant Securities directly to members of the Class during the Class Period.

        **q.**       **Defendant WeBull**

57.     Defendant Webull Financial LLC ("Webull") is a Chinese-owned financial company with its principal place of business in the United States at 44 Wall Street, Ste 501, New York, New York 10005.  Webull, is a broker-dealer registered with the SEC.  Webull Financial LLC is also a member of the Financial Industry Regulatory Authority ("FINRA"), Securities Investor Protection Corporation ("SIPC"), The New York Stock Exchange ("NYSE") and NASDAQ.

     ***The Fund Defendants***

        **a.**       **Defendant Citadel**

58.     Defendant Citadel Enterprise Americas LLC is a Delaware limited-liability corporation, headquartered at 131 South Dearborn Street, Chicago, Illinois. Citadel Enterprise Americas LLC is the corporate parent of, and controls the affairs of, Citadel Securities LLC.

59.     Defendant Citadel Securities LLC is a Delaware limited-liability corporation, headquartered at 131 South Dearborn Street, Chicago, Illinois. Citadel Securities LLC is a wholly owned subsidiary of Citadel Enterprise Americas LLC.

60.     Citadel Enterprise Americas, LLC and Citadel Securities LLC collectively, "Citadel."

61.     Defendant Citadel took short positions in the Relevant Securities and extended loans to cover other entities' short positions. Citadel actively participated in the conspiracy and the wrongful acts alleged herein.

### b.     Defendant D1 Capital

62.     Defendant D1 Capital Partners L.P. ("D1 Capital") is a Delaware limited partnership with its principal place of business at 9 West 57th Street, 36th Floor, New York, New York 10019.  Defendant D1 Capital operates hedge funds.

63.     Defendant D1 Capital took short positions in the Relevant Securities and actively participated in the conspiracy and wrongful acts alleged herein.

### c.     Defendant Melvin Capital

64.     Defendant Melvin Capital Management LP ("Melvin Capital") is a Delaware limited partnership headquartered at 535 Madison Avenue, 22nd Floor, New York, New York.

65.     Defendant Melvin Capital took short positions in the Relevant Securities and actively participated in the conspiracy and the wrongful acts alleged herein.

### d.     Defendant Maplelane Capital

66.     Defendant Maplelane Capital, LLC ("Maplelane Capital") is a Delaware limited-liability corporation with its principal place of business at 51 Astor Place, 10th Floor, New York, New York 10022.  Defendant Maplelane Capital operates hedge funds.

67.     Defendant Maplelane Capital took short positions in the Relevant Securities and participated in the conspiracy and wrongful acts alleged herein.

###     e.      Defendant Point72

68.     Defendant Point72 Asset Management, L.P. ("Point72") is a Delaware limited partnership with its principal place of business at 72 Cummings Point Road, Stamford, Connecticut 06902.  Defendant Point72 operates hedge funds.

69.     Defendant Point72 took short positions in the Relevant Securities and actively participated in the conspiracy and the wrongful acts alleged herein.

###     f.      Defendant Sequoia

70.     Defendant Sequoia Capital Operations LLC ("Sequoia") is a Delaware limited-liability corporation headquartered at 2800 Sand Hill Road, Suite 101, Menlo Park, California.

71.     Defendant Sequoia took short positions in the Relevant Securities and actively participated in the conspiracy and the wrongful acts alleged herein.

### *The Clearinghouse Defendants*

###     a.      Defendant Apex

72.     Defendant Apex Clearing Corporation ("Apex") is a New York corporation headquartered at One Dallas Center, 350 N. St. Paul, Suite 1300, Dallas, Texas.

73.     Defendant Apex participated in the conspiracy and the wrongful acts alleged herein.

###     b.      Defendant Depository Trust & Clearing Corporation

74.     Defendant The Depository Trust & Clearing Corporation ("DTCC") is a New York company headquartered at 55 Water Street, New York, New York.

75.     Defendant DTCC participated in the conspiracy and the wrongful acts alleged herein.

## JURISDICTION

76.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332(d)(2).  The aggregate claims of all members of the proposed class are in excess of $5 million, exclusive of interest and costs, and there are more than 100 putative class members.  Many members of the proposed class are citizens of a state different from Defendants.

77.     This Court has personal jurisdiction over Defendants because they are authorized to do business and do conduct business in this District, and because they have specifically marketed, advertised, and made substantial sales in this District, and have sufficient minimum contacts with this District and/or sufficiently avail themselves of the markets of this state through their promotion, sales, and marketing within this District such that the exercise of jurisdiction would not offend traditional notions of fair play and substantial justice.

## VENUE

78.     Venue is proper against Defendants in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District where Defendants, distributed, marketed, advertised, and sold the trading services which are the subject of the present complaint.  Finally, venue is appropriate in this District pursuant to 28 USC § 1391(b)(2) because a substantial part of the acts and omissions that gave rise to this Complaint occurred or emanated from this District.

## CO-CONSPIRATORS AND AGENTS

79.     Defendants' anticompetitive and unlawful acts were authorized, ordered, or performed by Defendants and their respective directors, officers, agents, employees, or representatives, while actively engaging in the management, discretion, or control of Defendants' business or affairs.

80.     Various persons and/or firms not named as Defendants may have participated as co-conspirators in the violations alleged in this complaint and may have performed acts and made statements in furtherance of such violations.

81.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and course of conduct alleged in this complaint.

82.     The agency relationships formed among the Defendants with respect to the acts, violations, and common course of conduct alleged in this complaint were consensually formed between the Defendant principals and agents.  Defendants' agents acted within the scope of their agency relationship with their own principals.  Defendants' agents acted under the explicit, implied, or apparent authority of their principals.  Further, Defendants acted on behalf of and were subject to the control of their principals, and they acted within the scope of authority or power delegated by their principals.

83.     Accordingly, the Defendant principals are liable for the acts of their agents. Likewise, the Defendant agents are liable for the acts of their principals conducted by the agents within the scope of their explicit, implied, or apparent authority.

## BACKGROUND

84.     Plaintiff incorporates by reference each of the allegations above and further alleges as follows:

85.     This is an action against online brokerage firms, the Brokerage Defendants, for engaging in an anticompetitive conspiracy with the Fund Defendants and the Clearinghouse Defendants, through conscious parallelism that impacted the value of various securities by preventing individual retailer investors who utilize these firms from being able to purchase specific stocks, including but not limited to GameStop Corp. ("GME"), AMC Entertainment ("AMC"),

and Nokia ("NOK"), and further restricting transactions related to these securities.  In addition to preventing these securities from being purchased, the Brokerage Defendants also raised the margin requirements for certain securities, further impacting retailer investors ability to purchase particular securities.  The result of this illegal market manipulation by these online brokerage firms was to drive the stock price of the specific securities down which led to the damages suffered by the Plaintiff and those similarly situated.

86.     In a free and open market, stock prices are determined by the laws of supply and demand.

87.     Plaintiff Ross, through Defendant Robinhood, purchased and owned 1 share of GME prior to January 28, 2021.

88.     Plaintiff Ross, through Defendant Robinhood, purchased and owned 77 shares of AMC prior to January 28, 2021.

89.     Plaintiff Ross, through Defendant Robinhood, purchased and owned 688 shares of NOK prior to January 28, 2021.

90.     Plaintiff Mercado, through Defendant Webull, purchased and owned 100 shares of AMC prior to January 28, 2021.

91.     Plaintiff Mercado, through Defendant Webull, purchased and owned 100 shares of GME prior to January 28, 2021.

92.     Plaintiff Bunya, through Defendant TD Ameritrade, purchased and owned 100 shares of AMC prior to January 28, 2021.

93.     Plaintiff Bunya, through Defendant Robinhood, purchased and owned shares of AMC prior to January 28, 2021.

94.     Plaintiff Bunya, through Defendant Robinhood, purchased and owned shares of NOK prior to January 28, 2021.

95.     Plaintiff Hunnicutt, through Defendant Robinhood, purchased and owned 75 shares of AMC prior to January 28, 2021.

96.     Plaintiff Ross suffered economic damages as a direct result of the actions of the Defendants related to the Relevant Securities that he owned.

97.     Plaintiff Mercado suffered economic damages as a direct result of the actions of the Defendants related to the Relevant Securities that she owned.

98.     Plaintiff Bunya suffered economic damages as a direct result of the actions of the Defendants related to the Relevant Securities that he owned.

99.     Plaintiff Hunnicutt suffered economic damages as a direct result of the actions of the Defendants related to the Relevant Securities that he owned.

### The Relevant Securities

100.    On January 4, 2021, GameStop ("GME") was priced at $17.25 per share.  On January 27, 2021, GME closed at $347.51 per share.  After the events of January 28, 2021, that stock plummeted to $193.60 per share, a decrease of over 44%.  In the week following the events of January 28, 2021, while many Brokerage Defendants continued to restrict specific trades and purchasing options, GME stock dropped to $63.77 on February 5, 2021.  This is the day that Defendant Robinhood finally removed all of the restrictions it had placed on certain stocks.

101.    On January 4, 2021, AMC Entertainment ("AMC") was priced at $2.01 per share.  On January 27, 2021, AMC closed at $19.90 per share.  After the events of January 28, 2021, that stock plummeted to $8.63 per share, a decrease of over 56%.  In the week following the events of

January 28, 2021, while many Brokerage Defendants continued to restrict specific trades and purchasing options, AMC stock dropped to $6.83 on February 5, 2021.

102.    On January 4, 2021, Nokia ("NOK") was priced at $3.89 per share.  On January 27, 2021, NOK closed at $6.55 per share.  After the events of January 28, 2021, that stock dropped to $4.69 per share, a decrease of over 28%.  In the week following the events of January 28, 2021, while many Brokerage Defendants continued to restrict specific trades and purchasing options, NOK stock dropped to $4.22 on February 5, 2021.

103.    On January 4, 2021, Koss Corporation ("KOSS") was priced at $3.19 per share.  On January 27, 2021, KOSS closed at $58.00 per share.  After the events of January 28, 2021, that stock dropped to $41.96 per share, a decrease of over 27%.  In the week following the events of January 28, 2021, while many Brokerage Defendants continued to restrict specific trades and purchasing options, GME stock dropped to $19.98 on February 5, 2021

104.    On January 4, 2021, Bed Bath & Beyond ("BBBY") was priced at $18.03 per share.  On January 27, 2021, BBBY closed at $52.89 per share.  After the events of January 28, 2021, that stock plummeted to $33.64 per share, a decrease of over 36%.  In the week following the events of January 28, 2021, while many Brokerage Defendants continued to restrict specific trades and purchasing options, BBBY stock dropped to $26.54 on February 5, 2021.

105.    On January 4, 2021, Express, Inc. ("EXPR") was priced at $0.93 per share.  On January 27, 2021, EXPR closed at $9.55 per share.  After the events of January 28, 2021, that stock plummeted to $4.70 per share, a decrease of over 50%.  In the week following the events of January 28, 2021, while many Brokerage Defendants continued to restrict specific trades and purchasing options, EXPR stock dropped to $3.14 on February 5, 2021.

106.     On January 4, 2021, Tootsie Roll Industries, Inc. ("TR") was priced at $29.86 per share.  On January 27, 2021, TR closed at $42.85 per share.  After the events of January 28, 2021, that stock dropped to $38.78 per share, a decrease of about 10%.  In the week following the events of January 28, 2021, while many Brokerage Defendants continued to restrict specific trades and purchasing options, TR stock dropped to $31.23 on February 5, 2021.

107.     On January 4, 2021, BlackBerry Ltd. ("BB") was priced at $6.58 per share.  On January 27, 2021, BB closed at $25.10 per share.  After the events of January 28, 2021, that stock plummeted to $14.65 per share, a decrease of over 40%.  In the week following the events of January 28, 2021, while many Brokerage Defendants continued to restrict specific trades and purchasing options, BB stock dropped to $13.23 on February 5, 2021.

### The Brokerage Defendants

108.     The Brokerage Defendants solicit customers to place securities trades through the websites, by using apps.  The Brokerage Defendants permit customers to purchase and sell securities, including futures contracts.

109.     Some brokerages charge the Retail Investors fees or accept commissions for personal trades.

110.     Other brokerages, like Defendant Robinhood, do not charge their Retail Investors a fee per transactions, but rather they earn revenue through rebates, kickbacks, and other payments from market makers like the Clearinghouse Defendants.

111.     On or about January 27, 2021, the Brokerage Defendants, while attempting to slow the growth of the Relevant Securities, and in an effort to deprive their customers of the ability to use their service, abruptly, purposefully, willfully, and knowingly decided to deny access to

specific securities on their app.  This willful action meant retail investors could no longer buy, or even search for the Relevant Securities.

112.    At least 18 brokerages together prohibited Retail Investors from opening new positions in GME, AMC and other Relevant Securities on January 28, 2021. Some restricted Retailer Investors from opening new, long positions in securities wholesale, whereas others restricted purchasing options only.  No brokerages restricted selling of Relevant Securities by all investors, whether by a Retail Investor or large institutional investor.

113.    For example, Defendant Stash prohibited users from viewing tickers for the Relevant Securities, and the pages only displayed loading graphics. Other tickers were under no such restriction and were easily searchable on the platform. Because of the Stash platform's design, a Retail Investor who cannot view the page for a particular asset cannot trade in that asset. As a result, Retail Investors were unable to access the page for the Relevant Securities to open new long positions in the Relevant Securities.

114.    The Verge reported that several Retail Investors reported that they had purchased and filled orders of GME and AMC on Robinhood using cash but discovered that the stock had been sold without their permission on January 28, 2021. Another Retail Investor reported that a case purchase of Naked Brand stock (NAKD) had been filled but subsequently sold without their consent.

115.    These actions were taken in an effort to retake control of the market from the Retail Investors and place it back in the hands of the Defendants who were losing money hand over fist based on their highly speculative short-selling strategies.  In a free and open market, there would be substantial financial risk that might increase thereby leading to the short sellers to cover the contract losses.

116.    On information and belief, the Brokerage Defendants' actions were done purposefully and knowingly to manipulate the market for the benefit of individuals and financial intuitions and to the detriment of the Brokerage Defendants' retail trading customers.

117.    Reporting throughout January 28, 2021, revealed that the ban on purchasing stock of the Relevant Securities was widespread among brokerages. On information and belief, the Brokerage Defendants adopted similar if not identical restrictions to Retail Investors from opening new positions in all, or at least one or more of the Relevant Securities. It is unlikely that they would have done so, but for the conspiratorial agreement. The market was essentially shut down with the purpose of benefitting the participants in the conspiracy and with the intent to harm Plaintiffs and the members of the Class.

118.    The Brokerage Defendants' respective explanations for their actions were confusing and contradictory. For example, Defendant Robinhood addressed the "Why don't I see a buy button?" question on its website here: https://robinhood.com/us/en/support/articles/why-dont-i-see-a-buy-button/. It offers three reasons for the buy button being unavailable on a user's account. The three reasons are: a) "It's a foreign stock, which we don't support." b) "It's an over-the-counter (OTC) stock or a warrant, which Robinhood generally doesn't support." c) "It's a stock undergoing corporate action. The stock will be tradable again once the corporate action has been finalized." Defendant Robinhood's explanations made little sense, however, because the Relevant Securities were not foreign stocks, OTC stocks or stocks undergoing corporate actions during the Class Period. Robinhood does not warn users of any situation where it could prevent users from buying stock out of its own volition.

119.     Defendants were aware that they were colluding to manipulate the market. In an interview given by Defendant Interactive Brokers' chairman Thomas Peterffy, Mr. Peterffy admitted that Interactive Brokers had restricted trading in order to "protect ourselves."

120.     Since restricting the purchase of these securities from their app, the stock's prices have gone up, depriving many investors of potential gains.

121.     Additionally, in the event GME goes down, the Brokerage Defendants have deprived investors of "shorting" GME in the hopes the price drops.

122.     Additionally, during the period of extreme interest and price movement on January 28, 2021, the Brokerage Defendants' retail customers could have secured profits from a combination of purchases and sales at different points throughout the trading day during this historic event.

123.     The Brokerage Defendants blocked retail investors from purchasing GME for no legitimate reason, thereby depriving retailer investors from the benefits of their services.

124.     The Brokerage Defendants continue to restrict purchases of the Relevant Securities, knowingly manipulating the market price by doing so.

### *The Fund Defendants and Clearinghouse Defendants*

125.     The Fund Defendants and Clearinghouse Defendants stood to lose enormous sums if the "Meme Stock" short-squeeze strategy was successful.

126.     The Fund Defendants and Clearinghouse Defendants were also in a position to exert significant pressure on the Brokerage Defendants.

127.     On or about January 27, 2021, the Fund Defendants and Clearinghouse Defendants exerted these pressures to secure an understanding from the Brokerage Defendants to restrict retail purchasing, thereby reversing the growth of the Relevant Securities.

128.    Analytics revealed a significant volume of GME short volume immediately prior to the markets opening on January 28, *i.e.,* after-hour traders were taking more short positions suggesting after-hour traders were trading in anticipation of a GME sell-off.

129.    Retail Investors cannot engage in after-hours trading. It is likely that this increase in short volume is the result of institutional investors, like the Fund Defendants, taking new short positions.

130.    The dramatic increase in short positions was counterintuitive. Chatter in various financial discussion forums indicated high excitement and motivation on the part of Retail Investors to continue investing in the Relevant Securities. Many Retail Investors announced plans to increase positions in the Relevant Securities on January 28, 2021, which would mean the prices for the Relevant Securities were likely to go further up, not down.

131.    The following day, the Clearinghouse Defendants raised the fees for consummating purchases of the relevant stocks to the non-conspiring brokerages, further facilitating the Fund Defendants covering of their short positions in furtherance of the conspiracy.

132.    Not all brokerages restricted the purchase of the Relevant Securities. Even in the cases where brokerages were allowing Retail Investors to open new long positions, however, the Clearinghouse Defendants began to raise fees to purchase securities or otherwise instruct brokerages to not consummate purchase orders.

133.    For example, nondefendant brokerage SoFi momentarily had trading in the Relevant Securities forcibly suspended by Clearinghouse Defendant Apex. SoFi quickly objected to Defendant Apex's attempt to restrict trading in the Relevant Securities on SoFi's platform and trading was soon permitted on SoFi without restriction.

134.     Anthony Denier, the CEO of Defendant Webull Financial LLC, a brokerage which had restricted trading in the Relevant Securities, placed the blame squarely on its clearinghouse, Defendant Apex Clearing, for the restrictions on trading the stocks. According to Denier, the collateral required by Apex for GameStop increased by 100% and Apex had informed him that Webull needed to shut off the ability to open new positions in certain stocks. Denier further said that the restrictions originated the morning of January 28, 2021 and was informed that Apex was instructed by the Defendant Depository Trust & Clearing Corporation that it was increasing the collateral needed to settle trades for the Relevant Securities.

135.     Denier further said that the restrictions originated the morning of January 28, 2021 and was informed that Defendant Apex was instructed by the Defendant Depository Trust & Clearing Corporation that it was increasing the collateral needed to settle trades for stocks such as GameStop.

136.     Other brokerages such as Defendants Ally Financial Inc., M1 Finance, Tastyworks, and Public.com also reported that Defendant Apex had halted all opening transactions of many of the Relevant Securities, which they blamed for trading restrictions of the Relevant Securities on their platforms.

137.     Similarly, Defendant Freetrade blamed Clearinghouse Defendant Barclay's PLC for its restrictions of the Relevant Securities on its platform.

138.     Defendant Trading212 uses Defendant Interactive Brokers as its intermediary and said Defendant Interactive Brokers was at fault for Defendant Freetrade's restrictions on the Relevant Securities.

139.     Defendants' conspiratorial acts resulted in lockstep price movements of the Relevant Securities that can only be explained by coordinated lockstep actions by Defendants, in

particular when considering Retail Investors were only permitted to sell positions in the Relevant Securities.

140.    Each artificial limitation in the amount of securities a Retail Investor could purchase correlated with a subsequent decrease in stock value. As purchases of the Relevant Securities were limited, more investors were pressured to sell who otherwise would not have in the presence of a free and open market.

141.    As the controversy intensified, Defendant Robinhood's conflict-ridden relationship with the Fund Defendants quickly came to light. In addition to its financial interest in Defendant Melvin Capital, it was revealed that Defendant Citadel regularly worked closely with Defendant Robinhood, serving as Defendant Robinhood's market maker over 60% of the time.

142.    Defendant Citadel also pays Defendant Robinhood for order flow. Payment for order flow is a kickback that a brokerage firm receives for directing orders to third party-market makers, like Citadel, for trade execution.

143.    Many of the other Brokerage Defendants have similar relationships with the Fund Defendants and/or unnamed co-conspirator entities who stood to benefit from restrictions on purchases of the Relevant Securities.

144.    In the end, rather than facing the consequences of their very risky bets, the Fund Defendants, the Clearinghouse Defendants, and their co-conspirators entered into an agreement and conspiracy to prevent the market from operating freely and openly, to force the prices of the Relevant Securities to drop, and to avoid their own financial losses at all costs.

### All Defendants

145.    The Financial Industry Regulatory Authority ("FINRA"), which governs brokers like Defendants, espouses rule 5310 regarding "Best Execution and Interpositioning." Rule

5310.01 requires that firms like Defendants' "*must make every effort to execute a marketable customer order that it receives promptly and fully.*" By failing to respond at all to customers' placing timely trades, outright blocking customers from trading a specific securities, and restricting others, Defendants have breached these, among other, obligations and caused their customers substantial losses due solely to their own negligence, failure to maintain adequate infrastructure.

146.    On information and belief, Defendants' acts of restricting securities transactions were an intentional effort to slow growth and to help benefit individuals and institutions who are not their customers, but are large institutional investors, potential investors, or other financial institutions.

147.    The actions of all Defendants occurred within a few hours of each other and all Defendants restricted substantially the same specific securities.

## CLASS ACTION

148.    Plaintiff brings claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Classes, as defined below:

> **CLASS 1: All persons or entities in the United States that directly purchased securities in GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), American Airlines Group Inc. (AAL), Bed Bath & Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Express, Inc. (EXPR), Koss Corporation (KOSS), Naked Brand Group Ltd. (NAKD), Nokia Corp. (NOK), Sundial Growers Inc. (SNDL), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG) from one or more of the Defendants between January 1, 2021 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").**

> **CLASS 2: All persons or entities in the United States that owned securities in GameStop Corp. (GME), AMC Entertainment Holdings Inc. (AMC), American Airlines Group Inc. (AAL), Bed Bath & Beyond Inc. (BBBY), BlackBerry Ltd. (BB), Express, Inc. (EXPR), Koss Corporation (KOSS), Naked Brand Group Ltd. (NAKD), Nokia Corp. (NOK), Sundial Growers Inc. (SNDL), Tootsie Roll Industries, Inc. (TR), or Trivago N.V. (TRVG) between January 1, 2021 through and until the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").**

149.     Additionally, or in the alternative, Plaintiff brings claims pursuant to Federal Rule of Civil Procedure 23 on behalf of the following Subclass, as defined below:

**All Robinhood customers who were not able to execute trades on January 28, 2021 related to specific securities after Robinhood knowingly, willfully, and purposefully removed it completely from their platform.**

**All TD Ameritrade customers who were not able to execute trades related to specific securities after TD Ameritrade knowingly, willfully, and purposefully restricted transactions.**

**All Webull customers who were not able to execute trades related to specific securities after Webull knowingly, willfully, and purposefully restricted transactions.**

150.     This class definition specifically excludes the following persons or entities:

a.   Any of the Defendants named herein;

b.   Any of the Defendants' co-conspirators;

c.   Any of Defendants' parent companies, subsidiaries, and affiliates;

d.   Any of Defendants' officers, directors, management, employees, or agents;

e.   All governmental entities; and

f.   The judges and chambers staff in this case, as well as any members of their immediate families.

151.     This action has been brought and may properly be maintained as a class action against Defendants pursuant to the provisions of Federal Rule of Civil Procedure 23.

152.     **Numerosity**: The precise number of members of the proposed Class is unknown to Plaintiff at this time, but, based on information and belief, Class members are so numerous that their individual joinder herein is impracticable. Based on information and belief and publicly available reports, Class members number in the hundreds of thousands and up to ten million. Subclass members are likely in the thousands. All Class and Subclass members may be notified of

the pendency of this action by reference to Defendants' business records, or by other alternative means.

153.    **Commonality**: Numerous questions of law or fact are common to the claims of Plaintiff and members of the proposed Classes. These common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. These common legal and factual questions include, but are not limited to the following:

a.    Whether Defendants knowingly failed to provide the financial services that were needed to handle reasonable consumer demand, including trading securities that are available on every other competitive trading platform;

b.    Whether Defendants failed to provide the duty of care to their customers when they purposefully restricted transactions;

c.    Whether Defendants restricted transactions purposefully to harm their customers' positions in these securities and benefit their own potential financial gains;

d.    Whether Defendants violated FINRA Rule 5310, among other FINRA rules, state rules, and federal regulations;

e.    Whether Defendants violated consumer protection laws in failing to disclose that their services would place restrictions on GME, and other securities, for substantial periods of time;

f.    Whether Defendants were in breach of their legal, regulatory, and licensing requirements by failing to provide adequate access to financial services;

g.    Whether Defendants were in breach of their contracts and/or the implied covenant of good faith and fair dealing in connection with their failure to provide financial services;

h.   Whether Defendants were negligent or grossly negligent by failing to provide financial services in a timely manner due to their own possible nefarious desires;

i.   Whether Defendants breached their fiduciary duties to customers by failing to provide adequate access to financial services;

j.   Whether Defendants were unjustly enriched by their conduct;

k.   Whether Defendants colluded with one another to illegal manipulate the stock market in order to protect their own interests or the interests of potential investors or financial institutions that were not their customers, the millions retail investors;

l.   Whether Plaintiff and the other Class members were injured by Defendants' conduct, and if so, the appropriate class-wide measure of damages, restitution, and other appropriate relief, including injunctive relief.

m.   Whether Plaintiff and the other Class members are entitled to injunctive and declaratory relief.

154.   **Typicality**: The claims of the named Plaintiff are typical of the claims of the proposed Classes in that the named Plaintiff was a customer and retail investor during the class period and was unable to trade GME and place time-sensitive trades on GME based on Defendant's restrictions and sustained damages as a result of Defendants' wrongful conduct.

155.   **Adequate Representation**: Plaintiff will fairly and adequately represent the interests of the Class in that he has no conflicts with any other Class members.  Plaintiff has retained competent counsel experienced in prosecuting complex class actions, including those involving financial services, and they will vigorously litigate this class action.

156.   **Predominance and Superiority**: There is no plain, speedy, or adequate remedy other than by maintenance of this class action.  A class action is superior to other available means,

if any, for the fair and efficient adjudication of this controversy. Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants. Additionally, given the relatively modest damages sustained by most individual Class members, few, if any, proposed Class members could or would sustain the economic burden of pursuing individual remedies for Defendants' wrongful conduct. Treatment as a class action will achieve substantial economies of time, effort, and expense, and provide comprehensive and uniform supervision by a single court. This class action presents no material difficulties in management.

157.    Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(A) because the prosecution of separate actions by individual members of the proposed Classes would create a risk of inconsistent or varying adjudications with respect to individual Class members, which may produce incompatible standards of conduct for Defendants.

158.    Class action certification is warranted under Fed. R. Civ P. 23(b)(1)(B) because the prosecution of separate actions by individual members of the proposed Classes would create a risk of adjudications with respect to individual Class members which may, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

159.    The prerequisites to maintaining a class action for injunctive or equitable relief pursuant to Fed. R. Civ. P. 23(b)(2) are met as Defendants acted or refused to act on grounds generally applicable to the Classes, thereby making final injunctive, declaratory, or equitable relief appropriate with respect to the Class as a whole.

160.    Class action certification is also warranted under Fed. R. Civ P. 23(b)(3) because questions of law or fact common to the Class members predominate over any questions affecting

only individual members, and a Class action is superior to other available remedies for the fair and efficient adjudication of this controversy. The amount of damages available to the individual Plaintiff is insufficient to make litigation addressing Defendants' conduct economically feasible for most, in the absence of the class action procedure.  Individualized litigation also presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system presented by the legal and factual issues of the case.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

161.    Class action certification is also warranted under Fed. R. Civ P. 23(c)(4) because questions of law or fact common to the Class members may be certified and decided by this Court on a class wide basis.

### CAUSE OF ACTION I
### For Breach of Contract – The Brokerage Defendants

162.    Plaintiffs hereby incorporate by reference the factual allegations set forth above.

163.    In order to use the Brokerage Defendants' trading platform, a potential customer must enter into the Customer Agreement with the Brokerage Defendants.

164.    Plaintiff and other class members did enter into a Customer Agreement with one or more of the Brokerage Defendants.

165.    The Brokerage Defendants breached their Customer Agreement by, among other things, failing to disclose that their platform was going to randomly pull a profitable stock from the platform; that they failed to provide adequate explanation to their customers; that they knowingly put their customers at a disadvantage compared to customers who used other trading apps; that they failed to provide access to their own financial incentives to halt purchases on certain securities; that they prohibited plaintiffs from performing in a timely manner (or at all) under the

contract; that they failed to comply with all applicable legal, regulatory, and licensing requirements; and that they failed to exercise trades and actions requested by customers.

166.    As such, the Brokerage Defendants breached their Customer Agreement with Plaintiff and Class members.

167.    The Brokerage Defendants' failure to perform and its breaches of the Customer Agreement resulted in damages and losses to Plaintiff and Class members and continues to expose them to harm because the Brokerage Defendants continue to fail to perform under the Customer Agreement. These losses reflect damages to Plaintiff and Class members in an amount to be determined at trial or separate proceedings, as necessary.

## CAUSE OF ACTION II
### Breach of the Implied Covenant of Good Faith and Fair Dealing – The Brokerage Defendants

168.    Plaintiffs hereby incorporate by reference the factual allegations set forth above.

169.    Plaintiffs and members of the Class and Subclass entered into the Customer Agreement with the Brokerage Defendants to open a trading account. They agreed to the Brokerage Defendants' Terms and Conditions by using the Brokerage Defendants' website and trading platform.

170.    Plaintiffs and members of the Class and Subclass fulfilled their obligations under these contracts by adhering to their terms and using the Brokerage Defendants' trading services through its website and trading platform.

171.    The Brokerage Defendants was obligated to provide the trading services required under those contracts at all times, including but not limited to, trades for the Relevant Securities.

172.    When initially signing up, Plaintiff and all those similarly situated could, and most actually did, trade the Relevant Securities.

173.    The Brokerage Defendants unfairly interfered with the rights of Plaintiffs and members of the Class and Subclass to receive the benefits of the Customer Agreement by, among other things, (i) failing to provide services necessary to carry out a trade; (ii) failing to provide certain trading services whatsoever; (iii) failing to inform individuals in a timely member of the drastic changes in trading abilities; and (iv) prohibiting plaintiffs from buying specific securities for Robinhood's own pecuniary interest and not disclosing those interest to Plaintiffs and all Class and Subclass members.

174.    The Brokerage Defendants' conduct has caused Plaintiffs and members of the Class and Subclass harm, losses, and damages.  These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings, as necessary.

### CAUSE OF ACTION III
### Negligence - The Brokerage Defendants

175.    Plaintiffs hereby incorporate by reference the factual allegations set forth above.

176.    The Brokerage Defendants had a duty to exercise reasonable care in conducting and facilitating transactions for their customers.

177.    The Brokerage Defendants had a duty to exercise reasonable care in providing trades on the free, open market for its customers.

178.    The Brokerage Defendants unlawfully breached its duties by, among other things, (i) restricting purchases on highly desired securities without notice from its trading app; (ii) failing to provide financial services related to those securities; (iii) failing to notify customers in a timely manner of the purchasing "blackout" on these highly desired securities.

179.    The Brokerage Defendants conduct as set forth in this Complaint was want of even scant care, and its acts and omissions were and continue to be an extreme departure from the

ordinary standard of conduct. Indeed, they were extreme and outrageous. Their actions breach any duty of care to their customers but are also inconsistent with the standard of care expected from similar firms in the open market.

180.     Upon information and belief, no institutions similar to the Brokerage Defendants have ever outright banned customers from purchasing a specific share of a specific security.

181.     The Brokerage Defendants abandoned their customers by restricting transactions related to highly desired securities, a standard of care so far below what is required for a business engaging in time sensitive trading services that it amounts to a complete abandonment of its duties.

182.     The Brokerage Defendants' grossly negligent and wrongful breaches of its duties owed to Plaintiffs and members of the Class and Subclass proximately caused losses and damages that would not have occurred but for the Brokerage Defendants gross breach of its duty of due care. These losses reflect damages to Plaintiffs and members of the Class and Subclass in an amount to be determined at trial or separate proceedings, as necessary.

## CAUSE OF ACTION IV
### Breach of Fiduciary Duty - The Brokerage Defendants

183.     Plaintiff hereby incorporates by reference the factual allegations contained herein.

184.     As a licensed provider of financial services, the Brokerage Defendants at all times relevant herein was a fiduciary to Plaintiff and Class members and owed them the highest good faith and integrity in performing its financial services on their behalf.  The Brokerage Defendants also acted as a fiduciary to each and every customer who agreed to the Customer Agreement.

185.     The Brokerage Defendants breached their fiduciary duties to Plaintiff and Class members by, among other things, restricting purchases on highly desired securities, failing to disclose in a timely manner that Robinhood would be restricting purchases; restricting purchases on highly desired securities for its own pecuniary benefits; failing to provide access to its financial

services in a timely manner; failing to comply with all applicable legal, regulatory, and licensing requirements; and failing to exercise trades and actions requested by customers in a complete and timely manner (also required by FINRA Rule 5310).

186.     The Brokerage Defendants conduct has caused Plaintiff and Class members' harm, losses, and damages and continues to expose them to harm because the Brokerage Defendants continues to breach its fiduciary duties. These losses reflect damages to Plaintiff and Class members in an amount to be determined at trial or separate proceedings, as necessary.

## CAUSE OF ACTION V
## Constructive Fraud – The Brokerage Defendants

187.     Plaintiff hereby incorporates by reference the factual allegations contained herein.

188.     The Brokerage Defendants had a duty to exercise reasonable care in conducting and facilitating the securities transactions of its customers.

189.     The Brokerage Defendants owed the Plaintiffs and Class members a fiduciary duty to fully disclose material facts as relates to the brokerage relationship.

190.     The Brokerage Defendants represented to Plaintiffs and Class members that they were brokerage services offering free and fair trading in the stock market.

191.     Plaintiffs and Class members chose to use one or more of the Brokerage Defendants' websites, apps, and trading platforms in part due to assurances that they would be able to trade on an open stock market.

192.     The Brokerage Defendants subsequently and selectively restricted and limited the securities that Plaintiffs and Class members were able to purchase on their websites, apps, and trading platforms, contrary to their representations.

193.     Plaintiffs and Class members reliance on the Brokerage Defendants' false and misleading representations were substantial factors in causing the Plaintiffs and Class members

harm as they were prohibited from trading freely and making their own decisions regarding their securities based on the unlawful and egregious restrictions placed on them by the Brokerage Defendants.

**CAUSE OF ACTION VI**
**Conversion – The Brokerage Defendants**

194.    Plaintiff hereby incorporates by reference the factual allegations contained herein.

195.    Plaintiffs and Class members owned, possessed, and had a right to possess the Relevant Securities, regardless of alleged market volatility.

196.    The Brokerage Defendants substantially interfered with Plaintiffs' and Class members' property by: knowingly and intentionally preventing the trading of the Relevant Securities; locking out accounts to prevent purchase of Relevant Securities; cancelling transactions of the Retail Investors; liquidating holdings and portfolios of Retail Investors; limiting the amount and volume of securities that were able to be purchased; freezing transactions on their websites, apps, and trading platforms; and freezing money that was stored in the accounts of Retail Investors, like Plaintiffs and the Class members.

197.    Plaintiffs and Class members did not provide their consent or permission for any of the aforementioned unilateral and unlawful actions taken by the Brokerage Defendants.

198.    The Brokerage Defendants and the Fund Defendants conspired to manipulate, freeze, or slow the stock transactions of the Relevant Securities.  The conspiracy's nature and purpose culminated with Brokerage Defendants freezing, cancelling, limiting, restricting, blocking, or liquidating the Relevant Securities.

199.    The Brokerage Defendants' willful and intentional actions caused Plaintiffs and Class members harm, loss, and damages and expose them to continuing harm.  These losses reflect

damages to Plaintiffs and Class members in an amount to be determined at trail or in separate proceedings, as necessary.

200.    The Brokerage Defendants acted with fraud, malice, or oppression such that Plaintiffs and Class members are entitled to recover punitive damages in an amount according to proof.

## CAUSE OF ACTION VII
### Violations of the Sherman Act 15 U.S.C. § 1 – All Defendants

201.    Plaintiff hereby incorporates by reference the factual allegations contained herein.

202.    Plaintiff brings this claim against all Defendants on behalf of the Class under federal law.

203.    Section 1 of the Sherman Act provides that "[e]very contract, combination, . . . or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." Understandings between competitors at the same market level to fix or control prices are *per se* unlawful.

204.    Defendants and their co-conspirators entered into a common understanding to unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, by wrongfully manipulating the transactions related to specific commodities, to whit particular securities, in the United States.

205.    Defendants engaged in conduct that caused direct, substantial, and reasonably foreseeable and intended anticompetitive effects on interstate commerce.

206.    In particular, Defendants have combined and conspired to prevent and manipulate the purchasing of specific securities by their collective retail investors.

207.    Faced with potentially disastrous losses due to their illegal short position, the Fund Defendants, rather than engage in competition, conspired, combined, agreed colluded and/or proceeded with conscious parallel action with the Brokerage Defendants and Clearinghouse

Defendants to restrict purchases in stocks by retailer investors, thereby artificially suppressing the price of stock, through which they could cover their short positions.

208.   In furtherance of the conspiracy, combination, agreement, and restraint of trade, on January 27, 2021, after the close of the stock market and before the open of the market the next day, the Fund Defendants coordinated and planned increased short volumes in anticipation of short calls on January 28, 2021.

209.   Pursuant to the contract, combination, agreement, conspiracy and restraint of trade, the Brokerage Defendants permitted the Fund Defendants to purchase stocks at the artificially deflated prices. The Fund Defendants, who were in exposed short positions due to the short squeeze, purchased the artificially price-suppressed stocks to cover their short positions.

210.   Not all brokerages joined in the anticompetitive scheme with the Brokerage Defendants. To induce compliance and to limit the effects non-complying brokerages could have in disrupting Defendants' anticompetitive scheme, the Clearinghouse Defendants raised the fees and/or removed the ability to fill purchases of the Relevant Securities to the non-conspiring brokerages, further facilitating the Fund Defendants covering of their short positions in furtherance of the conspiracy.

211.   In furtherance of the conspiracy, combination, agreement and restraint of trade, the Brokerage Defendants have prohibited, continue to prohibit, or unreasonably restrict the purchases of shares of the Relevant Securities by Plaintiffs in restraint of trade.

212.   As a result of Defendants' unlawful conduct, the stock prices for the specific securities in question were drastically impacted and the resulting loss to Plaintiff and the members of the putative Classes is substantial.

213.    The combination or conspiracy among Defendants consisted of a concerted action among Defendants.

214.    Such a combination or conspiracy existed by explicit agreement, or alternatively, can be inferred on the basis of conscious parallelism in light of the surrounding circumstantial evidence.

215.    Defendants were conscious of each other's conduct over the course of January 28, 2021, and this awareness was an element in their decision to restrict purchases over the entirety of the trading day.

216.    Over the course of the day, Defendants understood the ongoing effects of their concerted actions and intended that result.

217.    Defendants had a motive for concerted action. These motivations arose from many factors, including but not limited to: 1) pecuniary gain both direct and indirect from third-parties, 2) ideological, philosophical, and pecuniary motivations to stymie the Meme Stock trading strategy which had terrified the market; 3) pressure exerted by large-scale customers, large-scale finance industry actors, or government officials; 4) fear of backlash among influential actors in the finance industry for facilitating the Meme Stock collective retail trading strategy; 5) fear of political or regulatory backlash; and 6) other various pecuniary, ideological, or regulatory fears specific to each Defendant which caused them to enter into the common understanding as how to confront the Meme Stock problem.

218.    In taking these simultaneous, unprecedented actions, the Defendants acted in ways which appear to show actions against self-interest were it not for the common understanding and its underlying motives.

219.    For purposes of formulating and effectuating their combination or conspiracy, Defendants and their co-conspirators did the following:

a.  restricted many of the same particular securities as one another;

b.  prohibited the purchase of securities in order to manipulate the value of those securities for their own pecuniary interests and the benefits of third-parties, to the detriment of their retail trading customers;

c.  adjusted the margin requirements for the purchase of specific securities in order to manipulate the market; and

d.  knowingly and intentionally caused negative impact to the potential gains of their retail trading customers.

220.    As a result of Defendants' unlawful conduct, Plaintiff and Class members have been injured in an amount to be determined at trial or separate proceedings, as necessary.

221.    The alleged collusion, combination, or civil conspiracy is a *per se* violation of the federal antitrust laws.

### CAUSE OF ACTION VIII
### Tortious Interference with Contractual Relationship – All Defendants

222.    Plaintiff hereby incorporates by reference the factual allegations contained herein.

223.    There existed, between the Brokerage Defendants and the Plaintiffs and Class members, a contractual relationship.

224.    The Fund Defendants and Clearinghouse Defendants knew of these contractual relationships between the Brokerage Defendants and the Plaintiffs and Class members.

225.    The Fund Defendants and Clearinghouse Defendants intended to and knew that freezing, cancelling, limiting, or restricting transactions related to the Relevant Securities would

undoubtedly disrupt the Brokerage Defendants and their performance of the contractual responsibilities.

226.    Plaintiffs and Class members were unable to purchase the Relevant Securities on the open market freely.  Even when some of the harsher restrictions and all out bans were lifted, many of the individual securities remained severely limited in order to devalue the prices of those securities in favor of the Fund and Clearinghouse Defendants.

227.    On information and belief, the Fund Defendants and Clearinghouse Defendants requested, colluded with, conspired with, or outright demanded the Brokerage Defendants curtail the rising prices of the Relevant Securities, and the actions undertaken to that end were done purposefully, willfully, and knowingly to manipulate the market and to minimize the risk of loss on the "short" positions held by the Fund Defendants.  By restricting the Plaintiffs and Class members ability to perform transactions related to the Relevant Securities, these Defendants interfered with the contractual relationship between the Retail Investors and the Brokerage Defendants thereby causing harm, loss, and damages to the Plaintiffs and Class members.

228.    The Brokerage Defendants', Fund Defendants', and Clearinghouse Defendants' willful and intentional actions caused Plaintiffs and Class members harm, loss, and damages and expose them to continuing harm.  These losses reflect damages to Plaintiffs and Class members in an amount to be determined at trail or in separate proceedings, as necessary.

229.    The Brokerage Defendants, Fund Defendants, and Clearinghouse Defendants acted with fraud, malice, or oppression such that Plaintiffs and Class members are entitled to recover punitive damages in an amount according to proof.

**CAUSE OF ACTION IX**
**Violations of State Antitrust Laws – All Defendants**

230.    Plaintiff hereby incorporates by reference the factual allegations contained herein.

231.     Plaintiff brings this omnibus claim against all Defendants on behalf of putative Class members who made their relevant purchase(s) in Arizona, California, the District of Columbia, Hawaii, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, West Virginia, and Wisconsin.

232.     For purposes of this omnibus claim, the law of the state in which each putative Class member purchased their relevant stocks through any Defendants' service, or through any co-conspirator or current or former subsidiary of any Defendant, applies to that transaction.

233.     Defendants' conduct in restraint of trade described herein violated the following laws:

 a. Ariz. Rev. Stat. § 44-1401 *et seq.*

 b. Cal. Bus. & Prof. Code § 16700 *et seq.*

 c. D.C. Code § 28-4501 *et seq.*

 d. Haw. Rev. Stat. § 480-4.

 e. Iowa Code § 553.1 *et seq.*

 f. Kan. Stat. Ann. § 50-101 *et seq.*

 g. Me. Rev. Stat. Ann. tit. 10, § 1101 *et seq.*

 h. Mich. Comp. Laws § 445.771 *et seq.*

 i. Minn. Stat. § 325D.49 *et seq.*

 j. Miss. Code Ann. § 75-21-1 *et seq.*

 k. Neb. Rev. Stat. § 59-801 *et seq.*

 l. Nev. Rev. Stat. § 598A.010 *et seq.*

 m. N.H. Rev. Stat. Ann. tit. XXXI, § 356:1 *et seq.*

 n. N.M. Stat. § 57-1-1 *et seq.*

 o. N.Y. Gen. Bus. Law, § 340 *et seq.*

 p. N.C. Gen. Stat. § 75-1 *et seq.*

 q. N.D. Cent. Code § 51-08.1 *et seq.*

 r. Or. Rev. Stat. § 646.705 *et seq.*

     s.   R.I. Gen. Laws § 6-36-1 *et seq.*

     t.   S.D. Codified Laws § 37-1-3.1 *et seq.*

     u.   Tenn. Code Ann. § 47-25-101 *et seq.*

     v.   Utah Code Ann. § 76-10-911 *et seq.*

     w.   W. Va. Code § 47-18-1 *et seq.*

     x.   Wis. Stat. § 133.01 *et seq.*

234.    Plaintiff and putative Class Members who made their relevant securities purchases in the above jurisdictions have been injured by reason of Defendants' unlawful combination, contract, conspiracy, and agreement. Plaintiff and these putative Class members were unlawfully restricted in their ability to trade securities they owned as they saw fit.  This injury is of the type the antitrust laws of the above states were designed to prevent, and it is an injury that flows from what makes Defendants' conduct.

235.    Plaintiff and putative Class Members who made their relevant securities purchases in the above jurisdictions are accordingly entitled to damages, including statutory damages where applicable, to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above laws.

## JURY DEMAND

236.    The Plaintiff demands a jury trial on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Ryan Zachary Ross prays for the following relief:

a)    A judgment in favor of Plaintiff that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) and the Court direct that reasonable notice of this action, as provided under Rule 23(c)(2), be given to each member of the Class;

b)      A judgment in favor of Plaintiff that Defendants' unlawful conduct, conspiracy, or combination alleged herein be decreed:

1.   An unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

2.   A per se violation of Section 1 of the Sherman Act;

3.   An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of carious states' antitrust and unfair competition laws as set forth herein;

c)      A judgment in favor of Plaintiff and members of the Class to recover damages, to the maximum extent allowed under the law;

d)      A judgment in favor of Plaintiff and members of the Class to recover treble damages;

e)      A judgment in favor of Plaintiffs and members of the Class to recover punitive damages;

f)      A judgment in favor of Plaintiff and members of the Class to recover costs of suit including reasonable attorneys' fees, as provided by law; and

g)      Any and all other relief to which Plaintiff and members of the Class may be entitled.

Dated this 11th day of February 2021.                Respectfully submitted,


                                                     By: */s/ Gabriel A. Assaad*
                                                     Gabriel A. Assaad
                                                     Texas Bar No. 24076189
                                                     gassaad@mcdonaldworley.com
                                                     McDonald "Don" Worley
                                                     Texas Bar No. 24003208
                                                     don@mcdonaldworley.com
                                                     Matthew S. Yezierski
                                                     Texas Bar No. 24076989
                                                     matt@mcdonaldworley.com
                                                     McDonald Worley, PC
                                                     1770 St. James St., Suite 100
                                                     Houston, TX 77056
                                                     (713) 523-5500 – telephone
                                                     (713) 523-5501 – facsimile

                                                     William R. Ogden
                                                     Texas Bar No. 24073531
                                                     bill@fbtrial.com
                                                     Mark D. Bankston
                                                     Texas Bar No. 24071066
                                                     mark@fbtrial.com
                                                     Farrar & Ball LLP
                                                     1117 Herkimer St.
                                                     Houston, TX 77008
                                                     (713) 221-8300 - telephone
                                                     (713) 221-8301 - facsimile

                                                     **ATTORNEYS FOR PLAINTIFFS**